UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 13-cv-10010-KMM

ARNAUD GIRARD,

    Plaintiff,

vs.

THE M/Y "QUALITY TIME," Official #1184408,
HID# MDNC2013I405, her boats, tackle, apparel,
furniture, engines, and appurtenances, *in rem*,

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE came before the Court upon a non-jury trial on October 7, 2013. The vessel M/Y Quality Time ("the Quality Time") ran aground on December 26, 2012, near Key West, Florida. Trial Tr. (ECF No. 42), at 3. Salvage services were rendered by Plaintiff Arnaud Girard and Key West Marine Assistance. Id. at 5. The Parties do not dispute that a salvage award is due, but disagree as to the quantum of that award. Id. at 8. UPON CONSIDERATION of the evidence presented, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

### FINDINGS OF FACT

1. Tony Swindell is the owner and operator of the Quality Time, a 2005 42-foot Meridian motor yacht. Id. at 3. The Quality Time is insured by Boat U.S. Insurance. Id. at 219–221.

2. Arnaud Girard operates Key West Marine Assistance, a salvage company. Trial Tr., at 12.

3. Girard has assigned the salvage claim in this matter to himself individually and is representing himself in this proceeding. Id. at 70–71.

4. Girard has been active in the salvage industry for approximately thirty years and has previously completed salvage work in the Key West area. See id. at 12.

5. Jeffrey Sundwall works for Key West Marine Assistance. Id. at 123. Sundwall will likely receive a percentage of any salvage award in this Case. Id. at 206. Girard, Sundwall, and Key West Marine Assistance ("the Salvors") provided salvage assistance in this matter.

6. The Salvors operate the M/V Magic Penny ("the Magic Penny"), a 23-foot fiberglass skiff. Trial Tr., at 12–13, 75–76.

7. The Magic Penny carries, among other items, a hydraulic pump, underwater drills, a towline, and a spud. Id. at 76, 159.

8. On December 26, 2012, the Quality Time was en route to Key West from St. Petersburg, Florida, with Swindell and five other passengers on board. Id. at 3.

9. At approximately 8:22 p.m. the Quality Time struck a submerged object and began taking on water in the Northwest Channel approaching Key West. Id. at 4. Swindell promptly anchored the Quality Time in protected waters. Id. at 211.

10. The Coast Guard responded to the distress call and arrived on the scene within fifteen minutes. Trial Tr., at 211.

11. Girard heard the distress call on the radio. Id. at 13. Girard departed on the Magic Penny, picked up Sundwall, and arrived at the scene at approximately 8:49 p.m. Id. at 13, 98.

12. At the time the Salvors reached the Quality Time, the Coast Guard had removed the passengers and had begun dewatering the vessel. Id. at 67, 151.

13. The Coast Guard pump was losing prime and could not remove the water from the engine room, which had reached a water level of at least two and a half feet. Id. at 15–16, 151–53.

14. The Salvors used the Magic Penny's pump to dewater the engine room and the stern compartment. Trial Tr., at 15–17, 213.
15. The generator was turned off by Swindell before the Coast Guard arrived. Id. at 214. However, the Salvors did not receive a clear communication from Swindell as to whether the generator and the inverter were on or off. Id. at 19–20, 166. The Salvors believed that there may have been an active electric current on the Quality Time and took special caution as a result. Id. at 19–20, 102, 165.
16. The impact of the accident caused the propeller shaft to tear a hole in the fiberglass hull of the Quality Time. Id. at 129.
17. Sundwall conducted a dive outside of the Quality Time to attempt to plug the hole. Trial Tr., at 17–18, 159–161. This dive was conducted in the darkness and included the risk of contact with the jagged propeller blades. Id. at 20–22, 105–106. It may have been less dangerous to attempt to plug the hole from inside the vessel. Id. at 108.
18. Sundwall patched the hole with a foam patch, and a wooden wedge, which was provided by the Coast Guard. Id. at 24–25.
19. Once the flooding was under control, the Salvors were able to stabilize the boat through the use of the electric pump. Id. at 6.
20. The Coast Guard remained on the scene for at least thirty-three minutes after the Magic Penny arrived, and assisted in dewatering the vessel. Trial Tr., at 287. The Coast Guard departed with all six passengers, including Swindell, at approximately 9:22 p.m. Id. at 100.
21. The Salvors towed the vessel to Spencer's Boatyard in Key West and the vessel was hauled out of the water at approximately midnight. Id. at 100–101, 128.

22. The spectrum of salvage services provided by the Salvors consisted of patching, pumping, and towing, which are normal salvage services. Id. at 115.

23. During the salvage operation, the Magic Penny took on water due to a broken pipe. Trial Tr., at 117–18. This situation subsequently stabilized. Id. at 119.

24. The salvage operation took place within the Key West National Wildlife Refuge. Id. at 29–30.  There is no indication of any environmental damage caused by the accident, or any specific attempt to remedy such possible damage by the Salvors. Def.'s Proposed Findings of Fact and Conclusions of Law (ECF No. 41), at 13.

25. At one point during the night the wind speed reached twenty knots. Trial Tr., at 85. Otherwise the wind speed ranged approximately between nine and thirteen knots. Id. at 289.

26. The wave height was approximately two feet at maximum on the night in question. Id. at 83.  The waves were moderate. Id. at 211.

27. The tidal current on the night in question was approximately 1.6 knots. Id. at 96.

28. Girard and Boat U.S. Insurance could not agree on a settlement value to resolve this matter. Trial Tr., at 223–225.

29. The pre-casualty value of the Quality Time was $185,000, as supported by the testimony of marine surveyor and adjustor Brett Carlson. Id. at 252, 259.

30. The cost of the repairs from Spencer's Boatyard was $44,199.55. Id. at 140.

## CONCLUSIONS OF LAW

1. This action is within the admiralty and maritime jurisdiction of the Court pursuant to 28 U.S.C. § 1333.

2. The law of salvage rewards the voluntary salvor for the successful rescue of life or property imperiled at sea. Ocean Services. Towing & Salvage, Inc. v. Brown, 810 F. Supp. 1258, 1262 (S.D. Fla. 1993). Here, there is no dispute that the Salvors rendered successful salvage services. Trial Tr., at 8. The only issue in dispute is the quantum of a reasonable salvage award. Id.

3. Salvage awards are calculated as a percentage of the value of the salvaged vessel, which is obtained by subtracting the repair costs from the vessel's pre-casualty value. See Beach Salvage Corp. of Fla. v. The Cap't Tom, 201 F. Supp. 479, 482–483 (S.D. Fla. 1961).

4. There is no precise formula to determine a salvage award. Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd., No. 02-22644 CIV, 2004 WL 3310573, at *6 (S.D. Fla. Sept. 30, 2004). Rather, salvage awards are determined on a fact specific basis. Id. Where large values are involved, awards of more than twenty percent are rare. Atlantis Marine Towing, Inc. v. M/V Elizabeth, 346 F. Supp. 2d 1266, 1274 (S.D. Fla. 2004).

5. The factors to be considered when determining a salvage award amount are: a) the degree of danger from which the vessel was rescued; b) the post-casualty value of the vessel; c) the risk incurred in saving the vessel from the impending peril; d) the promptitude and skill displayed by the salvors; e) the value of the property employed by the salvors; and f) the time and labor expended in rendering the salvage service. See The Blackwall, 77 U.S. 1, *13 (1969); B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 339 (2d Cir. 1983). This Court will consider each of the factors in turn:

a. The Degree of Danger from which the Vessel was Rescued

The Quality Time was rescued from a low degree of danger. By the time the Salvors arrived, the Coast Guard had already removed the passengers and had begun dewatering the vessel. The weather was moderate and was not tumultuous or stormy.

b. The Post-Casualty Value of the Vessel

The post-salvage, pre-repair value of the vessel is $140,800.45. Trial Tr., at 140, 259. This figure is obtained by subtracting the cost of repairs, $44,199.55, from the pre-casualty valuation of $185,000. See id.

c. The Risk Incurred in Saving the Vessel from the Impending Peril

The Salvors took risks including diving outside the vessel, which included the risk of coming into contact with the Quality Time's propeller blades. None of the risks taken by the Salvors were unlike those faced typically by salvors. Risks must be out of the ordinary in order to liberally awarded in salvage cases. B.V. Bureau Wijsmuller, 702 F.2d at 340.

d. The Promptitude and Skill Displayed by the Salvors

The Salvors arrived on the scene promptly following the accident and displayed a level of skill and energy to be expected of professional salvors.

e. The Value of the Property Employed by the Salvors

The Salvors utilized the Magic Penny, as well as, primarily, a pump, a towline, and diving equipment, to pump, patch and tow the Quality Time. The property employed by the Salvors was not out of the ordinary for professional salvors.

  f. The Time and Labor Expended in Rendering the Salvage Services

  The Salvors expended approximately four hours of labor, using two men and one vessel. While the salvage was successful, the salvage involved no unusual risks to persons or property or special heroism or gallantry. <u>Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd.</u>, Case No. 02-22644 CIV, 2004 WL 3310573, at *6 (S.D. Fla. Sept. 30, 2004).

6. A salvage involving no special skills or equipment or significant amount of danger is considered a low level salvage and is equivalent to a salvage award of 5-10% of the vessel's post-casualty value. <u>Miami Yacht Drivers, Inc. v. M/V All Access</u>, Case No. 06-61729-CIV, 2007 WL 2484309, at *4 (S.D. Fla. Aug. 29, 2007); see also <u>Reliable Salvage and Towing, Inc. v. 35' Sea Ray</u>, Case No. 2:09-cv-329-FtM-99SPC, 2011 WL 1058863, at *12 (M.D. Fla. Mar. 21, 2011).

7. This Court finds that this was a low level salvage because there were no special salvage skills required and there was no significant amount of danger involved. The salvage consisted of normal salvage operations including pumping, patching, and towing, but did not include rescue of passengers who had been removed from the vessel by the Coast Guard.

8. This Court finds that the Salvors are entitled to an award on the high end of the 5-10% spectrum as the salvage was at nighttime, the diver incurred the risk of being cut by the propeller, and the Salvors were prompt and efficient. This Court therefore finds that the Salvors are entitled to an award of 10% of the Quality Time's post-casualty value.

9. This Court further finds that because the Salvors are professionals, they are entitled to an uplift of 2% of the vessel's post-casualty value in addition to the previously calculated

percentage. Miami Yacht Drivers, Inc., 2007 WL 2484309, at *4; Triplecheck, Inc. v. Cerole Yacht Charters Limited, Case No. 05-21182 CIV, 2007 WL 917276, at *6 (S.D. Fla. Mar. 25, 2007); Port Everglades Launch Service, Inc. v. M/Y Situations, Case No. 10-60571-CIV, 2011 WL 1196017, at *8 (S.D. Fla. Mar. 29, 2011).

10. This Court therefore determines that the Salvors are entitled to a total award of 12% of the Quality Time's post-casualty value of $140,800.45. Trial Tr., at 140, 259. This figure comes to $16,896.05.

## CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that judgment is hereby entered in favor of Plaintiff and against Defendant. Defendant is hereby ordered to pay Plaintiff the sum of $16,896.05. This Case is DISMISSED WITH PREJUDICE. The Clerk of Court is instructed to CLOSE this Case. All pending Motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 5th day of February, 2014.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record